*730 OPINION OF THE COURT
John P. DiBlasi, J.
In People ex rel. Arcara v Cloud Books (68 NY2d 553, 557 [1986]), the Court of Appeals stated that "New York has a long history and tradition of fostering freedom of expression, often tolerating and supporting works which in other States would be found offensive to the community”. Having in mind the greater protection afforded our citizens in the exercise of their right to free expression, this court must determine whether a municipal zoning ordinance, which appears "content neutral”, is nevertheless facially unconstitutional due to the lack of sufficient standards to guide local officials in their determination of whether to grant a special use permit to the operator of an adult bookstore at which a videotape "peep show” business is being conducted.
FACTUAL BACKGROUND
Plaintiff leases commercial property in the City of Newburgh (the City), and for more than one year has operated a retail store (the bookstore) where he sells adult videotapes. The certificate of occupancy which he obtained from the City permits his use of the premises as a mercantile establishment. Sometime after opening the bookstore, plaintiff installed 13 videotape viewing booths (the booths), which he contends are on his premises in order to provide his customers with "an opportunity to preview the videos offered for resale” (plaintiffs complaint para 7).[1] Since the bookstore is located in a C-3 zone in the City, plaintiff may operate a retail store there as of right. (Code of City of Newburgh § 300-102 [B].)[2] However, in *731 order to operate a theater, he must obtain a special use permit. (Code of City of Newburgh § 300-103 [hereinafter section 103].)[3]
Following his receipt of a notice of violation, which charged him, in substance, with unlawfully operating a movie theater in a C-3 zone, plaintiff pursued administrative remedies, the last of which was an appeal to the City’s Zoning Board of Appeals (the Appeals Board). In that appeal, plaintiff requested a determination of whether he was required to obtain a special use permit, and he challenged the constitutionality of Code of the City of Newburgh § 300-22 (B) (hereinafter section 22 [B]), which sets forth the showing that an applicant must make in order to obtain a special use permit. The Appeals Board ruled that section 22 (B) was not constitutionally infirm, and that plaintiff was required to obtain a special use permit to continue using the booths at the bookstore.
In lieu of further appealing the Appeals Board’s determination, or applying for a special use permit, plaintiff commenced this action seeking a judgment: (a) declaring that section 22 (B) and section 103 are unconstitutional; (b) declaring that he is entitled to continue operating his business, including the use of the booths, at the present location without obtaining a special use permit; and (c) restraining and enjoining defendants from enforcing the August 11, 1994 notice of violation. In their joint answer, defendants set forth three defenses. First, they claim that the Appeals Board’s determination of plaintiff’s constitutional challenge is res judicata as to that issue in this action. Second, they contend that section 22 (B) provides constitutionally sufficient standards for the exercise of the authority granted to the Appeals Board. Finally, they argue that section 22 (B) is "content neutral” in that it regulates only the location of a theater, and not the content of the expression conducted at the theater.[4]
CONSTITUTIONALITY OF SECTION 22 (b) AND SECTION 103
Resolution of the issue of the constitutionality of section 22 (B) and section 103 centers upon three considerations, namely, the focus of the Code sections, whether they constitute a valid *732 time, place and manner restriction, and the standards created by them to guide the Appeals Board in its determination of whether to grant a special use permit for a theater to operate in a C-3 zone.[5] In rendering its decision, the court is guided by two well-established principles. First, "[z]oning ordinances, like other legislative enactments, are presumed [to be] constitutional” (McMinn v Town of Oyster Bay, 66 NY2d 544, 548 [1985]; Lighthouse Shores v Town of lslip, 41 NY2d 7,11 [1976]). Second, the party attacking the facial constitutionality of zoning provisions bears the burden of establishing, beyond a reasonable doubt, that they are unconstitutional. (McMinn v Town of Oyster Bay, supra, 66 NY2d 548-549.)
FOCUS OF SECTION 22 (b) AND SECTION 103
Basic protections for free speech are established by both the Federal and State Constitutions. First Amendment of the United States Constitution provides that "Congress shall make no law * * * abridging the freedom of speech, or of the press”. By contrast, article I, § 8 of the New York Constitution provides that "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge *733 the liberty of speech or the press”. While both constitutional provisions protect free speech, it is clear that the State Constitution is broader in its statement that such freedom encompasses speaking, writing and publishing an individual’s views on all subjects. It is this broader view of free speech, together with this State’s long history of fostering free expression (People ex rel. Arcara v Cloud Books, 68 NY2d, at 557-558, supra), that has caused our State courts to recognize that "the minimal national standard established by the Supreme Court for First Amendment rights cannot be considered dispositive in determining the scope of this State’s constitutional guarantee of freedom of expression.” Indeed, our highest Court has repeatedly invoked the broader scope of article I, § 8 of the State Constitution to afford greater free expression protection than that which has been found to exist under the Federal Constitution. (See, People v P. J. Video, 68 NY2d 296 [1986]; People ex rel. Arcara v Cloud Books, supra; see also, Bellanca v New York State Liq. Auth., 54 NY2d 228 [1981], cert denied 456 US 1006 [1982].)
Despite the differences sometimes found in the extent of Federal and State free speech protections, both Constitutions clearly encompass motion pictures, even those such as the adult videotapes sold, and viewed in the booths, at the bookstore, among the types of protected expression. (Burstyn v Wilson, 343 US 495 [1952]; Kingsley Pictures Corp. v Regents, 360 US 684 [1959]; see, City of New York v S&H Book Shop, 41 AD2d 637 [1st Dept 1973].) Moreover, such Federal and State protections apply whether movies are viewed in the traditional theater setting, or by means of coin-operated machines. (See, Interstate Circuit v Dallas, 390 US 676 [1968]; Natco Theatres v Ratner, 463 F Supp 1124 [SD NY 1979]; City of New York v S & H Book Shop, supra.)
Plaintiff initially contends that section 22 (B) and section 103 create an unconstitutional "content based” prior restraint of his right to freedom of expression, in that they make the permissible operation of a theater in a C-3 zone dependent upon the obtaining of a special use permit, which can only be granted when defendant satisfies certain requirements set forth in section 22 (B).[6] This contention does not survive analysis of relevant case law.
*734 Government attempts to limit free expression are always closely scrutinized by the courts. (See, New York Times Co. v United States, 403 US 713 [1971].) Indeed, notwithstanding the reluctance of the Supreme Court to expand Federal constitutional protections in the area of freedom of expression (People ex rel. Arcara v Cloud Books, supra, 68 NY2d, at 557), any law that imposes a prior restraint upon the exercise of free speech "comes to [that] Court bearing a heavy presumption against its constitutional validity” (Bantam Books v Sullivan, 372 US 58, 70 [1963]; Carroll v Princess Anne, 393 US 175, 181 [1968]). Thus, if section 22 (B) and section 103 were focused upon limiting the public’s exercise of its free speech rights, plaintiffs burden of establishing their facial unconstitutionality would be greatly lessened. However, it is clear from a reading of the challenged provisions that they are, as defendants contend, "content neutral”, since they are not directed at specific types of expression, or at businesses where particular types of expression are conducted. (See, Clark v Community for Creative NonViolence, 468 US 288 [1984]; cf., Schneider v State, 308 US 147 [1939].)
Since section 22 (B) and section 103 are content neutral, they do not come before this court bearing the heavy presumption of unconstitutionality, as a matter of Federal constitutional law. (Cf., Bantam Books v Sullivan, supra.) Similarly, since they are not "directed at the message conveyed”, they are not "presumptively invalid and therefore subject to strict scrutiny” under State constitutional standards (Town of Islip v Caviglia, 73 NY2d 544, 556 [1989]). For that reason, consideration must be shifted to whether they are valid time, place and manner regulations. (See, Clark v Community for Creative NonViolence, supra; Town of Islip v Caviglia, supra.)
*735 TIME, PLACE AND MANNER RESTRICTION
Defendants’ central theme is that, to the extent they restrict the exercise of free expression rights, section 22 (B) and section 103 are not merely content neutral, but also constitute a valid time, place and manner regulation of those rights, under the standard enumerated in Renton v Playtime Theaters (475 US 41 [1986]).
In Renton (supra), the Supreme Court established the following three factor test to determine the constitutionality of a municipal ordinance which restricts the time, place and manner of the exercise of First Amendment protections:
First: Is the ordinance aimed at the content of the communications which are restricted or at the secondary effects of such communications on the surrounding community?
Second: Is the ordinance designed to serve a substantial government interest?[7]
Third: Does the ordinance provide for alternative avenues of communication?
• [2] As to the first factor, this court has already concluded that the challenged provisions are content neutral. Moreover, the ordinances are obviously designed to serve a substantial government interest, as required by the second part of the Renton test. Concerning that government interest, this court agrees with the stated conclusion of the Appeals Board that "[t]he obvious intent of the Special Use Permit provision is to provide review of those occupancies in a C-3 district which would involve the gatherings of numbers of people rather than retail stores which might involve only visits of individuals which [sic] would purchase their goods and depart” (Appeals Board decision, Jan. 31, 1995, plaintiff’s exhibit G).[8] Clearly, the goal of section 22 (B) and section 103 is to ensure that retail establishments properly located in a C-3 zone are not adversely affected by the influx of a large number of individuals whose presence at a theater-type business creates pedestrian and vehicular traffic and parking burdens. Such a *736 purpose is one which the court finds to be legitimate, no less than "preventing] the type of 'skid row’ environment caused by proliferation of sex-oriented businesses]” (see, Town of Islip v Caviglia, 141 AD2d 148, 160 [2d Dept 1988], affd 73 NY2d 544 [1989], supra; see also, Young v American Mini Theatres, 427 US 50 [1976]), or "preventing] crime, protecting] [a] city’s retail trade, maintaining] property values, and generally 'protecting] and preserving] the quality of [a city’s] neighborhoods, commercial districts, and the quality of urban life’ ” (see, Renton v Playtime Theaters, supra, 475 US, at 48). This purpose not only satisfies the substantial government interest requirement, but further demonstrates that the aim of the ordinances is at the secondary effects resulting from the operation of theaters and other large public gathering places, and not at the content of the communications "expressed” at plaintiff’s bookstore, or any of the businesses which require special use permits to operate in a C-3 zone.
Finally, as to the third prong of the Renton test, it is evident that section 22 (B) and section 103 do not prohibit all exercise of the particular mode of free expression involved herein, i.e.,. movie viewing, within defendants’ geographical limits (see, Young v American Mini Theatres, supra; Schad v Mount Ephraim, 452 US 61 [1981]), since alternative avenues of communication are provided by other sections of the zoning code. More specifically, pursuant to defendants’ Code, a theater, such as the bookstore now constitutes,[9] may operate in other zoning districts in the City, as of right (see, §§ 300-95, 300-111, 300-113, 300-121).
Evaluated under the Renton standards, section 22 (B) and section 103 are constitutionally sufficient. Beyond question, they are not aimed at any particular type or content of speech or expression, since their applicability depends not upon the nature of the expression conducted in a particular business, but instead upon the nature of the business itself, namely, whether it is a theater, motel, hotel, funeral parlor, school or assembly hall, such as would likely draw a substantial number of people to its location. Next, it has at its purpose a substantial government interest in providing retail business operators with an environment appropriate for the conduct of small retail concerns. Finally, taken together with other Code provisions, the two challenged sections permit the operation of a *737 movie theater in other portions[10] of the City without a special use permit, thus providing reasonable alternatives for the exercise of the constitutional rights at issue. Thus, as a matter of Federal constitutional law, the challenged provisions are facially valid, aside from the question of the standards applicable to the grant or denial of special use permits.
While plaintiff is correct in his contention that an evaluation under Federal standards does not end all inquiry into the constitutional questions raised herein (see, People v P. J. Video, supra; People ex rel. Arcara v Cloud Books, supra), analysis under State constitutional standards yields the same result. [11] Under the State Constitution, the validity of section 22 (B) and section 103 depends first upon their nature, i.e., whether they intentionally or incidentally restrict expression. (Town of Islip v Caviglia, supra, 73 NY2d, at 556.) "Intentional restrictions are directed at the message conveyed, either its content or the time, place and manner in which it is disseminated”. (Supra.) As with Federal constitutional analysis, intentional restrictions are "presumptively invalid and therefore subject to strict scrutiny” (supra). However, content neutral restrictions, relating only to time, place and manner of expression, without reference to content, "are valid if the governmental interest to be achieved outweighs the resulting interference with free expression” {supra, at 557).
As already noted, section 22 (B) and section 103 are not a purposeful effort to restrict free expression, and, even more so than the ordinance upheld in Caviglia, their impact upon free expression is merely incidental (see, supra, at 557). To the contrary, the City’s purpose was obviously to avoid the deleterious effects of having large crowd-drawing businesses within an *738 area zoned for small mercantile establishments, a goal well within the Town’s "broad power * * * to implement land use controls to meet the increasing encroachments of urbanization on the quality of life” (supra, at 550; see, Euclid v Ambler Co., 272 US 365 [1926]; see also, Matter of Harbison v City of Buffalo, 4 NY2d 553 [1958]). Moreover, rather than imposing a prior restraint on the constitutional protection afforded to movies, section 22 (B) and section 103 only incidentally affect that protection, by creating limitations on the location where theaters, among other businesses, may be conducted, while at the same time permitting the operation of such businesses as of right in several areas of the City (cf., Town of Islip v Caviglia, supra, 73 NY2d, at 558). Since "the [City’s] action was justified by concerns unrelated to speech”, the challenged provisions satisfy the first part of the State constitutional test (supra, at 558).
Nevertheless, the two Code provisions fail to meet the second part of the test, because, as will be seen in the discussion of the standards applicable to the issuance of special use permits, they are broader than necessary to achieve their purpose. It is to that controlling issue that the court now turns.
SPECIAL USE PERMIT ISSUANCE STANDARDS
Notwithstanding the general validity of these Code provisions as a time, place and manner restriction,[12] under the Federal Constitution, they are unconstitutional on their face, under both the Federal and State Constitutions, due entirely to the lack of sufficient standards set forth in section 22 (B), as read together with section 22 (C), by which the Appeals Board is to determine whether to grant or deny an application for a special use permit. Indeed, the very difficulty created by section 22 (B) was envisioned in Caviglia, where the Court of Appeals observed that the zoning ordinances challenged therein were "more compatible with free speech values than a licensing scheme which arguably could present opportunities for the improper exercise of discretion” (Town of Islip v Caviglia, 73 NY2d, at 559-560, supra).
In reviewing plaintiff’s challenge to section 22 (B), the court recognizes that "[t]he power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life
*739 in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits’ ”, (Schad v Borough of Mount Ephraim, supra, 452 US, at 68, quoting Moore v East Cleveland, 431 US 494, 514 [1977].) In determining if the City acted within constitutional limits in enacting section 22 (B), the court is guided by the rule that "when a zoning law infringes upon a protected liberty, it must be narrowly drawn”. (Supra.) Indeed, this requirement is recognized by the Court in Renton, which found that the ordinance at issue therein "[wa]s 'narrowly tailored’ to affect only the category of theaters shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal to the regulations in Schad v. Mount Ephraim” (Renton v Playtime Theatres, supra, 475 US, at 52).
On this motion, plaintiff’s central challenge is that section 22 (B) is facially unconstitutional because it fails to provide the Appeals Board with narrowly drawn standards to follow in ruling on a special use permit application. This argument is one which attacks section 22 (B) on the basis that it is not a valid time, place and manner restriction, because it violates the requirement that it be "narrowly tailored”, as recognized in Renton (supra).
Plaintiff also attacks section 22 (B) as being unconstitutionally vague, and asserts that it places a chilling effect on free speech. This claim of invalidity is directed at the provisions of section 22 (B) which require him to establish that "[t]he requested use is essential to the public convenience or welfare” (§ 22 [B] [2]), and that "the requested use will not impair the integrity or character of the zones or adjoining zones, nor be detrimental to the health, morals, or welfare” (§ 22 [B] [3]).
A vagueness attack lies when an ordinance requires or bans "the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application” (Connally v General Constr. Co., 269 US 385, 391 [1926]). Upon such a challenge, the court must apply a two-part test. "First, it must be determined whether the ordinance in question is sufficiently definite to provide a person of ordinary intelligence with fair notice that his conduct is forbidden by the ordinance” (Town of Islip v Caviglia, 141 AD2d 148, 163). Second, the court must determine whether the ordinance sets forth explicit standards for those who apply them in order to preclude ad hoc and subjective decisions, and the liklihood of arbitrary and discriminatory applications. (Grayned v City of Rockford, 408 US 104, 109 [1972]; People v Nelson, 69 NY2d 302, 307 [1987].)
*740 In his vagueness attack, plaintiff contends that the five factors that must be established by a special use permit applicant are themselves impermissibly vague, because the Appeals Board is not restricted to consideration of the 12 specific factors in section 22 (C). Consequently, he argues, under section 22 (B), "[c]itizens [are not] afforded fair warning of what is prohibited by law so that they may act accordingly” (People v Nelson, supra, 69 NY2d, at 307).
As is evident, both of plaintiff’s claims are but part of a single attack upon the lack of narrow tailoring of section 22 (B), as it must be read together with section 22 (C). Here, plaintiff may operate his bookstore in a C-3 zone with a special use permit, and in fact was informed that such an application could be submitted by him as a means of addressing his administrative challenge to the issuance of the notice of violation. However, as he correctly argues, the Appeals Board must make its determination on such an application by relying upon the standards set forth in section 22 (C) which, insofar as relevant, reads as follows: "Factors to be considered. In making such determination, the Zoning Board of Appeals shall give consideration, among other things, to any or all of the following as they may be appropriate” (emphasis added). Immediately following this language is a list of 12 specific factors. Plaintiff contends that the language permitting the Appeals Board to consider any things other than the 12 specific factors gives that Board the power to make the kind of ad hoc determinations that are constitutionally prohibited. (Grayned v City of Rockford, supra; People v Nelson, supra.)
For their part, defendants contend that section 22 (B) is constitutional because the factors that an applicant for a special permit must establish are measured against the list of 12 other factors that are considered by the Appeals Board (§ 22 [C]). Defendants’ position is that these 12 factors are part of the general standard governing the Appeals Board’s exercise of its delegated power. They further contend that New York law requires only a general standard to support the delegation of power to a Zoning Board of Appeals, relying upon Matter of Aloe v Dassler (278 App Div 975 [2d Dept 1961], affd 303 NY 878 [1952]) and Holy Sepulchre Cemetery v Town of Greece (191 Misc 241 [Sup Ct, Monroe County 1947], affd 273 App Div 942 [4th Dept 1948]). However, defendants’ reliance upon these cases is misplaced, because they address the issue of the standards that must be created to support a grant of authority from a municipal governing board to its zoning board, so that *741 the latter agency may make decisions regarding zoning. Neither of these cases, nor any other offered by defendants, supports their interpretation that since general standards will support the delegation of authority to a zoning board, the same general standards are therefore sufficient to meet constitutional requirements applicable to the exercise of that authority by the zoning board. Indeed, although the trial court in Holy Sepulchre Cemetery determined that the standards at issue therein were sufficient, it recognized, as all courts must, that a municipality cannot enact ordinances which conflict with State law (191 Misc, supra, at 244).
Not surprisingly, defendants offer no explanation to support their contention that the standards set forth in section 22 (B), as read in conjunction with section 22 (C), are constitutionally sufficient. Nor can this court find any basis upon which to reach such a conclusion, given the Federal and State constitutional requirement that where freedom of speech or expression is at issue, ''[precision of regulation must be the touchstone” (National Assn. for Advancement of Colored People v Button, 371 US 415, 438 [1963]; Interstate Circuit v Dallas, supra, 390 US, at 682, supra; see, Town of Islip v Caviglia, supra, 141 AD2d, at 166). Instead, defendants urge that section 22 (B) and section 103 are constitutional because they do not prohibit plaintiff’s special use entirely, but, to the contrary, they allow the special use to be conducted in alternate areas of the City.
The court rejects defendants’ contention that the existence of alternate locations for plaintiff’s bookstore, taken alone, supports the validity of section 22 (B) and section 103. It is true that "[a] municipality may control the location of theaters as well as the location of other commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city. The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating [such] ordinances.” (Young v American Mini Theatres, supra, 427 US, at 62.) Thus, as Young makes clear, merely because section 22 (B) and section 103 place restrictions on the location in which plaintiff may conduct his theater business does not render the two ordinances unconstitutional on their face.
However, the converse proposition, namely, that the existence of alternative locations for plaintiff’s bookstore makes the zoning provisions constitutionally sufficient, is not always true. As Renton itself makes clear, the fact that government *742 "do[es] not unreasonably limit alternate avenues of communication” is but one factor that must be established by defendants at bar (see, Renton v Playtime Theatres, 475 US 41, 47, supra).[13]
Pursuant to section 22 (C), the Appeals Board is given a specific list of 12 factors to consider in determining whether an applicant has made the requisite showing to obtain a special use permit as required by section 22 (B). Assuming, arguendo, that the five points which an applicant must prove pursuant to section 22 (B) are themselves sufficiently defined for constitutional purposes,[14] the ordinance is nevertheless invalid because it vests the Appeals Board with virtually unlimited discretion to grant or withhold a special use permit.
Both the Federal and State courts have "condemned the vesting of discretionary power in the hands of local officials so as to enable them to grant or deny permission needed to engage in a constitutionally protected activity” (Town of Islip v Caviglia, supra, 141 AD2d, at 166; Shuttlesworth v Birmingham, 394 US, at 147, 151 [1969]). Indeed, any law that "subject[s] the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective and definite standards to guide the licensing authority is unconstitutional” (Shuttlesworth v Birmingham, supra, 394 US, at 150-151).
Cases addressing licensing schemes in a variety of contexts have found the placing of unfettered discretion into the hands of an administrative agency to be facially unconstitutional. (See, Saia v New York, 334 US 558 [1948] [ordinance prohibiting use of sound amplifiers without permission of police chief]; *743 Kunz v New York, 340 US 290 [1951] [ordinance barring public worship on streets without permit from administrative official]; 414 Theater Corp. v Murphy, 360 F Supp 34 [SD NY 1973], affd 499 F 2d 1155 [2d Cir 1974]; Natco Theatres v Ratner, 463 F Supp 1124 [SD NY 1979], supra; Avon 42nd St. Corp. v Myerson, 352 F Supp 994 [SD NY 1972] [ordinance lacking sufficient standards to guide Commissioner of Consumer Affairs in ruling on licenses to operate movie theaters]; Bayside Enters. v Carson, 450 F Supp 696 [MD Fla 1978]; People v Mitchell, 74 Misc 2d 1053 [Crim Ct, NY County 1973].)
Thus, in People v Mitchell (supra), the court struck down a New York City ordinance which gave the Commissioner of Consumer Affairs discretion to issue or deny licenses to individuals who sought to operate places of public amusement. Defendant Mitchell was the operator of a bookstore who, like plaintiff at bar, maintained coin-operated motion picture machines. In an effort to limit that type of "peep show”, a licensing requirement was imposed, pursuant to which the Commissioner was given the discretion to issue "[s]uch licenses * * * which, in his judgment, may be essential for the welfare and benefit of the people and the visitors of the city”. (Supra, at 1054.) The court concluded that such a licensing scheme could not withstand constitutional scrutiny because it gave absolutely unlimited discretion to the Commissioner "to establish any and all conditions he might wish for the granting of the required license, and he may do so without any standards whatsoever to guide him” {supra, at 1058). As the court therein observed, the ordinance would "permit [the Commissioner] to set such terms and conditions as would make it impossible for any applicant to meet” (supra).
Similarly, in Bayside Enters. v Carson (supra), a local ordinance was held unconstitutional where it gave a local Sheriff unfettered discretion to issue or deny licenses to applicants seeking to operate adult entertainment establishments. Although the Sheriff was to be guided by the standard that licenses were to be issued only to persons of good moral character, the court concluded that "[t]he effect of the Code’s 'good moral character’ criterion is to allow the Sheriff to deny a license to whomever he pleases and to legitimize that action through reference to a criterion which is so imprecise as to be virtually unreviewable” (450 F Supp, at 707, supra).
Likewise, in Caviglia (supra), the Appellate Division invalidated a zoning provision which contained no guidelines for the Zoning Board to apply in deciding whether or not to issue a *744 special exception permit that would allow an adult establishment into a zone where it would not be permitted to operate as of right. In that case, the Zoning Board was to rule upon such applications after holding a public hearing. However, no standards limiting the exercise of the board’s discretion were set forth in the ordinance. The Court recognized that such a provision "gives the Zoning Board the right to impose restrictive conditions on the adult-use businesses on the basis of subjective factors which may serve to disguise content censorship” Csupra, at 166).[15]
Finally, in Marcus v Town of Henrietta (207 AD2d 1026 [4th Dept 1994]), in its review of a challenge to a zoning ordinance which required application for a special use permit, but did not provide sufficiently narrow, objective and definite standards to guide the governing board, the court found that the criteria in the challenged ordinance "confer[red] broad discretion upon the Town Board, leaving the permit process open to the kind of arbitrary action that is 'inherently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view’ ” (Marcus v Town of Henrietta, supra, 207 AD2d, at 1027, quoting Heffron v International Socy. for Krishna Consciousness, 452 US 640, 649 [1981]).
Throughout the case law on licensing schemes runs the common thread that "if the articulated standards for the official to apply are vague or general, the spectre of censorship may exist just as clearly as where there are no standards at all” (Bayside Enters. v Carson, supra, 450 F Supp, at 706; Shuttlesworth v City of Birmingham, supra). At bar, this same vagueness in the standards which are to guide the Appeals Board in ruling on a special use permit application requires this court to find the ordinance unconstitutional.
Any question as to the constitutionality of section 22 (B) commences and concludes with a reading of the opening language of section 22 (C) preceding the 12 factors which guide the Appeals Board. That opening paragraph states that "[i]n making such determination, the Zoning Board of Appeals shall give consideration, among other things, to any or all of the following as they may be appropriate” (emphasis added). No limitation of any kind is placed upon the "other things” which may be considered by the Appeals Board. Obviously, absent *745 any restrictions upon the other things that may be considered, the Appeals Board could deny a special use permit based upon such improper factors as the race, sex, religion, or nationality of the applicant, or merely because the applicant was disliked by one of the members of that reviewing board. Indeed, the very concern that plaintiff herein asserts, namely, that the ordinance can be used to censor the content of protected speech, is entirely within the realm of possibility, since the "other things” permitted for consideration can include the very nature of the expression which plaintiff seeks to exercise at his bookstore.
Nor can it be credibly argued that the existence of the 12 specific factors somehow restricts the otherwise uncontrolled discretion of the Appeals Board. While it is true that the Appeals Board may limit itself to those factors, it is equally evident, as section 22 (C) itself states, that "any or all” of such factors may be considered, "among other things”. Given the plain language of this ordinance, it is beyond all doubt that although section 22 (B) and section 22 (C) may be content neutral on their face, they could very easily be used as a censorship statute, to the extent that individuals seeking, for instance, to operate movie theaters which show nonobscene, but politically controversial, films, could be excluded from conducting their businesses in certain areas of the City merely because members of the Appeals Board are opposed to the political views displayed in such films. Such a risk is present, and is real. For, as the Court stated in Saia v New York, in striking down an ordinance which controlled the use of loud speakers: "[w]hen a city allows an official to ban them in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas. In this case a permit is denied because some persons were said to have found the sound annoying. In the next one a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound. The power of censorship inherent in this type of ordinance reveals its vice.” (334 US, at 562, supra.) Just as annoyance at ideas can be cloaked in annoyance at sound, so too can annoyance at ideas, or constitutionally protected forms of expression, be cloaked in concerns for appropriate zoning.
Upon this analysis, it is evident that the vice suffered by section 22 (B) and section 103 renders them unconstitutional for failure to meet the requirement of sufficient narrowing applicable to time, place and manner restrictions as a matter of Federal constitutional law. (Renton v Playland Theatres, supra, *746 475 US, at 52.) It is also evident that these provisions fail the second part of the State constitutional test, in that they are clearly broader than needed to achieve the City’s purpose of controlling the pedestrian and traffic burden placed upon a particular type of business zone by limiting the types of nonconforming businesses that may be operated in such zones. (Town of Islip v Caviglia, supra, 73 NY2d, at 556.) Although the two provisions do not completely bar all such nonconforming uses from C-3 zones, the City has given its Appeals Board overly broad authority to determine which nonconforming businesses may be operated in a C-3 zone, and in so doing, has granted the Board the power to resolve applications for such permits on an ad hoc and completely subjective basis. (Supra.) Such an overly broad approach to the zoning problem the City sought to address renders section 22 (B) and section 103 unconstitutional as a matter of State constitutional law. (See, People ex rel. Arcara v Cloud Books, supra, 68 NY2d, at 558-559.) Finally, the placing of such ad hoc decision-making power in the hands of the Appeals Board also makes these provisions unconstitutionally vague. (Grayned v City of Rockford, supra; People v Smith, 44 NY2d 613 [1978].)
In sum, "[a]lthough [the City] may enact regulations in the interest of the public safety, health, welfare or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print or circulate information or opinion” (Schneider v State, 308 US 147, 160, supra). Notwithstanding what may be the legitimate concerns of the City, its effort to regulate the operation of businesses such as theaters, including the type conducted by plaintiff, through a grant of discretion involving the three-word phrase "among other things”, which is to guide the Appeals Board in deciding applications under section 22 (B), is constitutionally impermissible. Therefore, the court concludes that Code of the City of Newburgh § 300-22 (B) and § 300-103[16] are unconstitutional on their face, and plaintiff is entitled to summary judgment in his favor.
THE REMEDY TO BE INVOKED
Defendants, relying upon Matter of Aloe v Dossier (278 App Div 975, supra) and Matter of Ehret v Bates (18 AD2d 938 [2d Dept 1963]), contend that if section 22 (B) is invalid, the result *747 is that the Appeals Board is prohibited from granting special use permits, and consequently, that plaintiff may not operate a theater in a C-3 zone. However, neither case controls the situation at bar. In Ehret, the Court invalidated an ordinance which authorized a zoning board to permit an enlargement of a nonconforming use, while in Aloe, the ordinance invalidated by the Court permitted the board to grant a variance of the application of another ordinance so that a gasoline station could be operated in a business district. In both cases, absent the permitted variance, the nonconforming use was prohibited by existing zoning regulations.
To the contrary, at bar, section 22 (B) authorizes the Appeals Board to grant or deny special use permits. Such a permit "allows the property owner to put his property to a use expressly permitted by” another ordinance, i.e., section 103 (see, Matter of North Shore Steak House v Board of Appeals, 30 NY2d 238, 243 [1972]; see also, Matter of Shepard v Zoning Bd. of Appeals, 92 AD2d 993 [3d Dept 1983]). "The inclusion of the permitted use in the ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood.” (30 NY2d, at 243, supra.) In this manner, the special use permit at issue herein differs from a variance, in that the latter "is an authority to a property owner to use property in a manner forbidden by the ordinance” (supra).
Since section 103 recognizes that nonconforming uses such as theaters may be conducted in C-3 zones, and unlike the ordinances in Aloe and Ehret (supra), does not prohibit such uses absent the grant of a variance, the court concludes that the appropriate remedy in this action is to declare that plaintiff may conduct his bookstore and "theater” business at his present location in a C-3 zone without the necessity of obtaining a special use permit. (See, Shepard v Zoning Bd. of Appeals, supra, 92 AD2d, at 995; Marcus v Town of Henrietta, 207 AD2d 1026, supra; Town of Islip v Caviglia, supra, 141 AD2d, at 167, 168.)
Further, the remedy of invalidating the special use permit requirement is consistent with the "fundamental rule that an unconstitutional part of a statute may be severed and rejected, while the valid portion may stand” (Town of Islip v Caviglia, supra, 141 AD2d, at 167). It also recognizes the express statement by the City’s governing board, found in the severability provision (Code of City of Newburgh § 1-5), that if any portion *748 of the Code is determined to be invalid, the remainder of the Code shall continue in effect.[17]
Finally, by permitting plaintiff to operate his business in the C-3 zone without a permit, the court avoids the impermissible effect of depriving other nonconforming use business owners of their property without due process of law, a result that would follow if the court accepted defendants’ position. Thus, if the court concluded that the Board was not authorized to grant permits for special uses, no entity could lawfully conduct a special use in any C-3 zone in the City. This would have the effect of declaring that any theater, motel, hotel, assembly hall, funeral parlor, public school or business school presently located in a C-3 zone would be prohibited from continuing its operation.[18] Such a result is clearly in violation of the property rights of such business owners, protected by the Fifth and Fourteenth Amendments of the United States Constitution and article I, §§ 6 and 7 of the State Constitution, and cannot be permitted by any remedy imposed by this court. (See, Pennsylvania Coal Co. v Mahon, 260 US 393, 415 [1922]; Lutheran Church v City of New York, 35 NY2d 121, 132 [1974], supra)
CONCLUSION
For the reasons set forth above, this court concludes that section 22 (B) and section 103 are unconstitutional on their face, and cannot validly continue to be enforced by defendants. In so ruling, the court recognizes that the governing officials of the City of Newburgh may believe that their zoning prerogatives have been ignored, and that some of the residents of the *749 City may feel that a business of which they disapprove is being given judicial permission to continue its operation.[19]
While the court understands such feelings, all those who consider themselves adversely effected by the decision in this action must themselves understand that protection of individual liberties related to expression is of concern to everyone. Although such issues often are presented in the context of protected rights which may be exercised by only a minority of the entire population, and while the particular protected form of expression may be viewed unfavorably by the majority, the underlying need for courts to ensure that the liberties guaranteed to all of us are preserved is the guiding principle in all such cases, including one involving Matthew Barbulean’s operation of his adult videotape viewing business. Perhaps the significance of these rights was best described in Schneider v State, by Justice Roberts, when he wrote that: "This court has characterized the freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.” (308 US 147, 161, supra.)

. Plaintiff has stated that approximately 10% of his videotapes are purchased, while approximately 90% are viewed (Appeals Board decision, Jan. 31, 1995, plaintiff’s exhibit G, at 2). Given the fact that he charges $5 for the opportunity to view a videotape for 30 to 45 minutes, and that the viewing machines are coin operated, the court would not be mischaracterizing plaintiff’s business by labeling it a "peep show” operation. Nevertheless, as seen herein, the constitutional considerations applicable to plaintiff’s business are the same as those applicable to any movie theater.

. A retail store is defined as a store engaged in selling merchandise to the general public for personal or household consumption and rendering services incidental to the sale of such goods. (Code of City of Newburgh § 300-4.)

. This section of the Code defines special uses which require permits in C-3 zones to include theaters, motels, hotels, assembly halls, funeral parlors, and public and business schools.

. By decision and order dated April 20, 1995, this court denied defendants’ motion to dismiss plaintiff’s complaint, and suggested that the parties consider an appropriate application following joinder of issue. Defendants having answered, both sides now move for summary judgment.

. Defendants initially argued that plaintiffs failure to further appeal the adverse determination of the Appeals Board renders that Board’s ruling on all issues presented to it binding upon him. Since the doctrine of res judicata is applicable to the quasi-judicial decisions rendered by administrative agencies such as the Appeals Board (see, Ryan v New York Tel. Co., 62 NY2d 494, 499 [1984]; Freddolino v Village of Warwick Zoning Bd. of Appeals, 192 AD2d 839, 840 [3d Dept 1993]), "one who objects to the act of an administrative agency must exhaust available administrative remedies before being permitted to litigate in a court of law” (see, Watergate II Apts, v Buffalo Sewer Auth., 46 NY2d 52, 57 [1978]; see also, Young Men’s Christian Assn. v Rochester Pure Waters Dist., 37 NY2d 371, 375 [1975]). However, there is "an exception to the exhaustion doctrine where one has raised claims that an agency’s action was unconstitutional or wholly beyond its grant of power” (DGM Partners-Rye v Board of Architectural Review, 176 AD2d 875, 876 [2d Dept 1991]; see, Watergate II Apts. v Buffalo Sewer Auth., supra; see also, Young Men’s Christian Assn. v Rochester Pure Waters Dist., supra). Since plaintiff is attacking the constitutionality of section 22 (B), he may do so in this declaratory judgment action, even absent a further administrative or judicial challenge to the ruling of the Appeals Board. (See, Lyons & Co. v Corsi, 3 NY2d 60 [1957], appeal dismissed 355 US 284 [1958]; Perrotta v City of New York, 107 AD2d 320 [1st Dept 1985]; see also, Genesis of Mount Vernon v Zoning Bd. of Appeals, 81 NY2d 741 [1992] [upholding trial court’s ruling that a zoning ordinance’s definition of "boarding house” was unconstitutional notwithstanding prior contrary ruling by Zoning Board of Appeals].) Therefore, defendants’ first affirmative defense, which sets forth the procedural bar of res judicata, is without merit.

. In full, section 22 (B) reads as follows:
"Conditions to be fulfilled. In applying for a special permit use, the applicant need not demonstrate hardship, since the basis for the action is general benefit to the city as a whole. In granting a special permit use, the Zon *734 ing Board of Appeals, with due regard to the nature and condition of all adjacent structures and uses, the zoning within the same is located, the Master Plan and any relevant urban renewal plans, shall find all of the following general conditions to be fulfilled:
"(1) The use requested is listed among the special permit uses in the zone for which application is made.
"(2) The requested use is essential or desirable to the public convenience or welfare.
"(3) The requested use will not impair the integrity or character of the zone or adjoining zones nor be detrimental to the health, morals or welfare.
"(4) The requested use will be in conformity with the Master Plan.
"(5) Consistency with policies.”

. As to this factor, the court must determine whether the challenged ordinances are "narrowly tailored” {supra, at 52). As will be seen, this is the primary difficulty for defendants.

. Although defendants do not offer proof as to any study they conducted to support the conclusion that the businesses that are classified as nonconforming uses in a C-3 zone will have the effects asserted, plaintiff makes no challenge to the ordinances on this ground. (Cf., Renton v Playtime Theaters, supra, 475 US, at 50-52.) Therefore, the court shall review the ordinances upon the assumption that they are supported by an adequate study.

. Plaintiff does not challenge this classification of his business on this motion. For that reason, the court accepts this designation for the purpose of deciding the constitutional issue.

. Plaintiff does not contest either the existence of other zones where he may locate his business, nor the sufficiency of the size of such alternative zones. Therefore, the court need not consider whether the combined acreage of the other zones provides a meaningful opportunity for plaintiff to conduct his business. (Cf., Renton v Playland Theatres, 475 US, at 53-54, supra.)

. In Town of Islip v Caviglia (73 NY2d 544, supra), the Court of Appeals, in affirming the decision below upholding the constitutionality of a zoning ordinance addressed to "adult” businesses, first applied the three-part Renton test. The Court then went further and reviewed the challenged ordinance under a separate State constitutional analysis because it recognized that in the area of freedom of expression, the Supreme Court "has displayed great reluctance to expand Federal constitutional protections, holding instead that the subject is governed essentially by community standards” (cf., Miller v California, 413 US 15 [1973]), while the courts of this State have a long history of fostering free expression (Town of Islip v Caviglia, supra, 73 NY2d, at 556).

. That is, section 22 (B) and section 103 satisfy the three Renton standards, without reference to the issue of their sufficient "tailoring”.

. Plaintiff contends that the existence of alternative locations for his business is not determinative of the question of the constitutionality of the ordinances, relying upon language in Schneider v State to the effect that freedom of expression may not be "abridged on the plea that it may be exercised in some other place” (308 US, at 167, supra). To the extent he bases this argument on the proposition that section 22 (B) and section 103 are content based regulations, he is wrong, there being no support for the conclusion that these provisions are anything other than content neutral.

. It may be true that these five standards are themselves vague, in that they provide no guidance to an applicant as to what must be shown to prove, for instance, that his proposed special use "is essential or desirable to the public convenience or welfare” (§ 22 [B] [2]; see, People v Dominick, 68 Misc 2d 425 [Erie County Ct 1971]), notwithstanding that the Appeals Board is given the list of 12 considerations to rely upon in making the special use permit determination. Nevertheless, the court need not reach this issue since "[i]t suffices for the disposition of this [action] to draw attention to the infirmities which [this Court] ha[s] noted” (see, People v Taub, 37 NY2d 530, 535 [1975]).

. This aspect of the Appellate Division’s ruling in Caviglia was not appealed to the Court of Appeals. (See, 73 NY2d, at 549, supra.)

. Code § 300-103 cannot have any validity on its own, since it defines those businesses which require a special use permit to operate in a C-3 zone. For that reason, if section 22 (B) cannot stand, so too does section 103 fall.

. Although not specifically argued by defendants, the court has considered, and rejected, merely striking out the "among other things” language of section 22 (C). Such an approach would leave a list of 12 specific factors for the Appeals Board to consider, with no opportunity for the Appeals Board to consider any other factor, whether constitutionally permissible or not. Nevertheless, such a remedy would constitute an act of law making by this court for the City, by imposing a limitation on the factors that the Appeals Board may consider on a special use permit application, contrary to the City’s obvious intent, made clear by the present language of section 22 (C), that its Appeals Board would not be limited to those 12 factors.

. Absent the right for the operator of a currently permissible special use business to continue conducting its business in a C-3 zone, the City would be in violation of the rule that for "[a] zoning ordinance to be validly applied [it] cannot, for one thing, serve to prohibit use to which the property is devoted at the time of the enactment of the ordinance” (Lutheran Church v City of New York, 35 NY2d 121, 129 [1974]).

. Nevertheless, the City is not powerless to limit the operation of businesses such as plaintiffs in a C-3 zone. Indeed, as the Court of Appeals held in Cavaglia, such businesses can be terminated as nonconforming uses by means such as amortization provisions. (Town of Islip v Caviglia, supra, 73 NY2d, at 560-561.)